(No. 19408.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN BARNHILL, Plaintiff in Error.

*Opinion filed December 20, 1929.*

GEORGE W. SPRENGER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, EDWARD P. ALLEN, State's Attorney, and JOEL C. FITCH, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John Barnhill and another were indicted for robbery while armed with a pistol, were convicted in the circuit court of Adams county and sued out this writ of error to reverse the judgment. Upon confession of error on behalf of the People the judgment was reversed as to Barnhill's co-defendant and as to him the cause was remanded. The cause remains for decision as to the plaintiff in error, Barnhill.

The commission of the crime was proved by the testimony of Albertus Janssen, the assistant cashier of the Exchange State Bank of Golden, that on the morning of August 20, 1928, a man poked him in the back with a pistol, knocked off his hat and ordered him to "stick 'em up." Janssen was compelled to open the safe, and a second man who was there took money from the safe and put it in a suitcase which he had. Janssen was then bound, gagged and lay down on the floor as he was ordered to do and the robbers left. Janssen testified that neither of these two men was Barnhill, whom he knew.

By the testimony of other witnesses it was shown that these two robbers arrived in Golden in a stolen Whippet automobile, the property of George L. Mead, of Prairie City, in the northeast corner of McDonough county, who had put it in his garage there at 11:30 o'clock the night of August 19. It was stolen between that time and 5:00 o'clock in the morning of August 20. The automobile, with the robbers in it, stopped at the oil station of Henry J. Gerdes, in Golden, between 7:30 and 8:00 o'clock in the morning of August 20. One of the men bought four gallons of gasoline there to fill the tank and got out of the car to inspect the

oil. The oil station was just west of the depot, and the bank was 200 or 250 feet southwest of the oil station. The automobile and the two men were at the oil station for several minutes and were seen there by the witnesses Gerdes, Woerman, Schuster and Winkle. About thirty minutes later the automobile was parked at the curb on the west side of the street, in front of the bank, and about ten or fifteen minutes later one of the men came out of the bank, carrying a suitcase. He got into the automobile. As Schuster testified, when he first saw the car there no one was in it. He then saw a boy get into it and drive it to the door of the bank, where he sounded the horn. A man then came out of the bank, carrying the suitcase, got into the car, took the wheel, made the half-turn to the south into Front street and headed south out of town. Schuster observed the license number of the car, 50365. The bank alarm sounded about two minutes after the car made the turn into Front street. Schuster and Gerdes were about 90 feet away, just across the road, at the elevator. The robbery had occurred between the time when the tank of the Whippet car was filled with gasoline at the Gerdes oil station and the departure of the same car from in front of the bank. Both incidents had been observed by Gerdes and Schuster.

No direct evidence was produced against Barnhill. His case is wholly circumstantial. He had lived in Golden and its vicinity for seven or eight years but not since June, 1928. He was a customer of the Exchange State Bank. In 1927 he was the owner of a registered Percheron stallion which was making the season at the farm of Elmer Leerhoff, two miles east of Golden. A bill advertising the fact was posted on the bill-board in the bank and remained there until the latter part of March or the first of April, 1928. The bank building is on the west side of Main street, facing east, and the bank occupies the ground floor. The building is about 40 by 50 feet and a stairway leading to the floor

above is taken off of the south side. There is a main banking room in front, on the south side, which has a railing or fence around it, separating it from the lobby, above which is the cage, which prevents any person getting into that room. Inside this railing and cage are the clerks' desks and the employees of the bank do their work there. West of the banking room, and separated from it by a brick wall, in which is a door connecting the two rooms, is the directors' room. This room is in the southwest corner of the building, and besides the door into the banking room there is a door entering it from the north. The entrance to the bank is at the east end, near the north side of the room. A person entering the lobby through this door faces the east end of the banking room, with its railing and cage, and just around its northeast corner is the door opening from the north into the banking room. Further back is what is called the rest room, where there is an extra table for customers to sit at. This room is separated from the rest of the room by a railing, only, and is in the northwest corner of the building. There is nothing back of the rest room but a window and a door in the west end of the building. The bank has two vaults—one in the banking room, and the other, the west vault, in which the safe is kept, at the east end of the directors' room. It is steel-lined, fireproof, and has a time-lock and a burglar alarm. Barnhill was familiar with the furniture and fixtures in and about the bank and the location of the vault. In the latter part of March or the first of April, 1928, Barnhill, after asking permission, took down the poster advertising the stallion, carried it to a side-desk and there apparently wrote upon it, looking up and then down from time to time while he did so. The poster was taken from the bank and was found later under the circumstances to be indicated. It is claimed by the prosecution that Barnhill furnished a plan of the arrangement of the furniture and fixtures of the bank and the location of the vaults to the actual perpetrators of the

crime for their information and assistance in putting into effect the scheme to rob the bank. He had lived for two or three years four or five miles southeast of Golden, on a farm just north of Missouri creek where it was crossed by a north and south road, and had also rented land just south of Missouri creek. On August 20, 1928, he was living in Peoria, employed by the Peoria Airway Division, selling vacuum cleaners.

The Whippet car in which were the robbers with the proceeds of their crime was driven rapidly south out of Golden. During the forenoon deputy sheriffs went out on the highways east and south from Golden looking for a car which might have been parked along the road in woods or a corn-field. Driving east four miles they turned south at a cross-road, which they followed two miles to just beyond where it crossed Missouri creek. There they saw fresh automobile tracks leading into a lane to the west. It was not a public lane but just a little driveway on the right-hand side of the road back into the brush and woods. There was a gutter there, in which the tracks could be seen plainly. It was not muddy—just plain enough to make good tracks. The tracks showed that two cars had turned into the lane coming from the north and had come out and had gone back to the north. There were no other tracks than these two. They went back about 100 yards. Persons could not be seen going west in the lane after they got 100 feet from the north and south road. The tracks left by one car—the lighter of the two—were made by Fisk tires from which the tread had not been worn. The tracks made by the other car were smooth. The lighter car had been parked alongside the lane about a block from the highway and the heavier car had been parked about 100 feet further on. Both cars had been turned and taken out, the heavier car leaving first. Where the lighter car had been parked a number of torn pieces of paper were found. When put together it was apparent that some pieces were missing.

Upon a second search, made the following day, other fragments were found which were somewhat faded, since it had rained in the meantime. On one side of the paper was Barnhill's printed advertisement of his stallion and on the other was a sketch of the banking room and its furnishings, with the vaults and articles of furniture and their location indicated by words in the handwriting of Barnhill. There were several dozen of the fragments and a few small scraps were missing, but they were not material either to the advertisement or the sketch. When carefully pieced together, as they were, the document was restored substantially to its original integrity. The evidence on the trial showed that the handwriting on the paper was Barnhill's. Almost all Whippet automobiles were equipped with Fisk tires of the kind which left the tracks leading into and out of the lane just beyond Missouri creek. The circumstances thus shown in evidence can be explained on no theory other than that Barnhill planned the robbery. His calling at the bank, using as an excuse the request to be permitted to take the card, his writing at the side-desk as he looked up from time to time, his knowledge of the lane at Missouri creek, the parking of the cars there approximately at the time of the robbery, the destruction of the sketch after it had served its purpose, in the absence of explanation show that Barnhill abetted the robbery if he did not originate the plan of the crime. This evidence could not be overcome by the testimony that he was in Peoria at the time of the robbery. No attempt was made to explain the preparation of the plan of the bank, its being found immediately after the robbery under circumstances indicating its use and possession by the robbers in executing the crime, and its destruction when no longer needed. Barnhill did not testify on the trial but contented himself with his plea of not guilty.

A part of the money stolen was gold coin of the value of $285. Earl Pickerel was produced as a witness for the People on October 5, 1928, and testified that he lived

at Gilson, eleven miles southeast of Galesburg, and had known Barnhill for more than fifteen years; that he had a conversation with Barnhill, the exact date of which he could not tell, but in his judgment it was five or six weeks before he testified and was after August 20. Barnhill drove into his driveway between eight and nine o'clock at night and called to Pickerel to come out to the car. Pickerel did so, and Barnhill asked if he had any money. Pickerel laughed and said "no." Barnhill asked, "Do you want to make any money?" Pickerel said, "That is different." Barnhill said, "Will you give me a check for $180 for $200 in gold?" Pickerel said, "I could not handle it, John; I am unable to handle it; I could not do it." Barnhill said, "Could you use $100 of it?" Pickerel said, "No, I could not use any of it." Barnhill asked, "Do you know of anybody that could?" Pickerel said he did not, and Barnhill said he had to go; that there was no need to be afraid of it; and to Pickerel's question where he got the gold, he answered that he took it from a bootlegger; that he was a prohibition agent. On cross-examination Pickerel said that he could not swear that the conversation was after August 20, and it was moved that his testimony be stricken, but the motion was denied, and it is contended that in this there was error. It was not. The conversation occurred, and from all the circumstances proved it was for the jury to determine whether it was before or after August 20.

On cross-examination of the defendant's witness Dean Adams, the State's attorney asked the following question: "You testified in this last case that Barnhill was charged with stealing an automobile, did you not?" Upon objection to the question the State's attorney, without any ruling, asked the following question: "Did you testify— I don't want to ask you anything here that is at all unfair but I want to show the interest of this man. Haven't you testified in a lawsuit in which Barnhill has been a defend-

ant before?" An objection was sustained. It is apparent that the State's attorney was not seeking an unfair advantage. He acquiesced in the first objection and after the ruling of the court abandoned the subject. He ought not to have asked either question, but the judgment cannot be reversed for his doing so when the objection was promptly sustained.

The torn poster, restored as nearly as possible to its original condition by placing the fragments together in the same relation to one another as they originally sustained and fastening them in that condition with transparent tape, was offered in evidence as People's "Exhibit 4" and admitted over the defendants' objection that it had never been shown to be in the possession of the defendants or in any way connected with them or with the robbery and was too remote. The testimony tended to show that Barnhill made the plat of the interior of the bank on the back of the poster in the bank a short time before the robbery; that he was known to the employees of the bank but the two men who actually robbed the bank were strangers to them; that these two left the bank in a Whippet car; that a Whippet car containing two men was driven rapidly over the road to the place where the torn fragments of the poster were found—a place with which Barnhill was familiar and which was off the traveled road and concealed from view. These things all tended to show the connection of Barnhill with the making of the plan of the interior of the bank, its use by the robbers and a conspiracy for the robbery of the bank. The objection was properly overruled and the paper received in evidence. It was for the jury to determine the weight which should be given to it.

People's "Exhibit 3" was a photographic copy of "Exhibit 4." It was offered because the original, being in pencil, was becoming blurred. It was objected to because it was a copy. The original being in evidence it was unnecessary to introduce a copy, though it was no doubt prudent,

under the circumstances, to have a photographic copy made to guard against the loss, destruction or obliteration of the original. Since the original was before the jury and no changes were shown to have been made in it except the tearing and the restoration which appeared on its face and were explained by the testimony, the copy was not admissible, but it could not have done any harm to the plaintiff in error.

The People's fourth instruction is objected to because, as the hypothesis on which to base a verdict of guilty, it requires the jury "to be satisfied, after considering all the evidence, beyond a reasonable doubt," that the defendant is guilty, instead of "to be satisfied, beyond a reasonable doubt, after considering all the evidence." There is no difference in the meaning of the two forms.

Objection is made to the fifth instruction that it told the jurors that they were not bound to believe anything to be a fact because a witness has stated it to be so, provided they believe from all the evidence or lack of evidence that the witness was mistaken or has knowingly testified falsely. The instruction is futile. It means that the jury are not bound to believe a witness if after considering all the evidence they do not believe him. Certainly no one competent to sit on a jury needs an instruction to that effect.

A motion was made for a new trial on the ground of newly discovered evidence, but the affidavits in support of the motion disclosed no evidence. Two police officers of the city of Peoria made affidavit that they had received information immediately after the trial, from sources which they deemed reliable, who the persons were who robbed the bank, and had ascertained that one of them was Donald Chandler, who is under arrest in Chicago charged with robbery; that the affiants know the other robber but for reasons of public policy are unwilling now to disclose his identity. If given two weeks' time the affiants state that they will be able to apprehend the last mentioned robber and bring him before the bar of the court, and if a new

trial is granted will appear as witnesses and testify to the foregoing facts. The affidavit does not state a fact to which the affiants could testify. It is strong in the expression of opinions and promise of the production of undisclosed evidence, but the affidavits carefully avoid giving to the court the information of which the affiants claim to possess great abundance. The court's judgment must be based upon facts shown and not on hopes or promises of evidence to be obtained in the future or opinions based on information not disclosed. The motion for a new trial was properly denied.

The judgment is affirmed.  *Judgment affirmed.*